Guardian VA Claim Consulting versus Platkin. Good morning, Your Honors, and may it please the Court, Martine Saccone for the appellate. I'd like to reserve three minutes for rebuttal.  I'll turn directly to the issues raised in this Court's letter to the parties from earlier this week, beginning specifically with the question whether Veterans Guardian's employees are agents and attorneys, as those terms are used in federal statutes governing veterans' benefits. The answer to that question is no. Veterans Guardian does not employ any lawyers, so the question whether its employees are attorneys can be set to the side. Veterans Guardian's employees are also not agents. The relevant federal statutes do not define that term, and for that reason, we think it's appropriate to look to common understandings of the term agent as it is used in law. In our opening brief, we quote several authoritative definitions of the term agent, all of which contemplate the relationship in which the agent stands in the shoes of the principal. In particular, the third restatement of agency defines agency as, quote, the fiduciary relationship that arises when one person, a principal, manifests assent to another person, an agent, that the agent shall act on the principal's behalf and subject to the principal's control. Even so, you take the position that what's covered by the New Jersey statute is broader than the agents and attorneys under federal law, but it appears that, at least in letters and in the Q&A, that the Department of Veterans Affairs has taken the position that it reaches any assistance. So, are these really coextensive? In my view, no, Your Honor, and I certainly agree with you that the Veterans Administration does not agree with our reading of federal law, but I submit that the Veterans Administration is simply misreading the statute. 38 U.S.C. 5901, which is the only operative prohibition in federal law, says, and I quote, no person may act as an agent or attorney in the preparation, presentation, or prosecution of a claim for benefits unless accredited by the Secretary. Okay. So, let's talk about prepare. Do you prepare? Do you present? Do you prosecute? Does anyone from your client stand up in the agency? Absolutely not. Not orally, not in writing, not submitting anything, not sending any letters? No, Your Honor. Do they sign any pleadings? No, Your Honor. Do they help prepare any of the forms? They do help prepare, Your Honor. In the sense of, like, who's filling in the blanks and who's signing on those forms? So, the way that it works, after a claim strategy is arrived at in partnership with the veteran based on the information that the veteran provides, Veterans Guardian will develop a working draft of the claims packet, which has been reviewed by the veteran, and changes are made before the veteran submits the claim to the Veterans Administration. Changes are made. Do you make some of the changes? Yes, Your Honor. Okay. So, the question then is how broadly to read preparation? Because you're not presenting or prosecuting. Why should we read prepare narrowly? I don't think that that's the operative question. I think the operative question is whether we prepare as an agent. As agents. Okay. Why are you not agents? Because, Your Honor, as I just read, the definition of agent assumes a relationship in which the agent stands in the shoes of the principal. And if you bear with me for a moment, I'd like to direct your attention to the notes to the restatement definition, which say, quote, not all relationships in which one party provides services to another satisfy the definition of agency. A relationship of agency always contemplates three parties, the principal, the agent, and third party with whom the agent is to deal. And this is even more on point to this case. If a service provider simply furnishes advice and does not interact with third parties as the representative of the recipient of advice, the service provider is not acting as an agent. All right. Which section of the restatement, in which notes? That section 101 is the definition of agency in the third restatement. That describes Veterans Guardian to a T. What Veterans Guardian does is serve as a consultant and advisor to its clients as they prepare to file their own claims before the agency. It does not file claims on its client's behalf. It does not liaise with the Veterans Administration on behalf of veterans. And it does not serve in any representative capacity with respect to the agency. Does it stand in a fiduciary relationship with the client? It may. There may be a duty of agency. But again, I think the restatement notes are clear. In fact, I didn't quote it, but there is a provision that is directly after what I read that says that you may have a fiduciary responsibility, but still not a relationship of agency. And I think it's important. I think the court should understand that an accredited claims agent, which is what is, of course, that is the requirement for accreditation, right? If you're going to act as a claims agent. Though the activities of a claims agent, even with respect to preparation, are very different than what our client says. If a veteran is working with an accredited claims agent, the first thing that accredited agent will do is submit a form to the VA identifying himself or herself as the agent for that veteran. Like an entry of appearance form. Yes. And that allows the accredited agent to have access to the veteran's entire service file. Should we read the New Jersey law? Should we read the New Jersey law as covering you or not if you are not agents or attorneys? Your Honor, I think if New Jersey had stopped at section 1A1, then we would say that it is co-extensive with federal law. It specifically aligns itself with federal law. A1 itself wouldn't be the problem. The problem is A4. That's right. The problem is A4, and I think that A4 directs how you read A1. So New Jersey argues that A4 is mirroring section 5904C1. But if I can quote from that, that section says, a fee may not be charged, allowed, or paid for the services of agents or attorneys with respect to services provided before the date of an initial decision. We could read it the other way around. We could read A4 in light of A1, right, to say that that's only for the agents and attorneys, perhaps. I mean, that's not the most natural reading, but if we've got constitutional problems, we might lean on A4. I agree, Your Honor. I think, I agree it's not the most natural reading, but I do agree that if this court were to, for example, impute the carve-out from A1 into A4, that would essentially solve our problem, but we would be pleased to accept a reading of New Jersey law that does align with federal law because we do not violate federal law. But I would urge this court to make clear that we do not violate federal law because it's important to remember that the Attorney General is the enforcer of New Jersey's law of S3292. And so, insofar as they understand Veterans Guardian to violate federal law and therefore to violate their law, we are under threat of liability. We are under threat of having our business shut down. Of course, we have already shut down prophylactically, and we are under threat of liability for money damages as well. How could we opine on that when we don't have before us the Secretary of Veterans Affairs? We don't have a challenge per se to the constitutionality of the federal statute. We're looking at the New Jersey statute. So, would this be an appropriate case for us to opine on the coverage or constitutionality of the federal statute? So, I think there's, I think, two responses with respect to the textual reading of the federal statute. I think, as the Supreme Court reaffirmed last year in Loper Bright, this court is the arbiter of how the statute should be read. I think the statute is clear on its face that it only applies to agents and attorneys. That's the only way to read the text that is the text. And as we've discussed, Veterans Guardian does not act as an agent. So, I think with respect to how to read the federal law, this court is well-positioned to make that determination. Again, we do not challenge the constitutionality of the federal statute because the statute does not injure us. It does not impair our First Amendment rights. It is the New Jersey statute that does that because, as Judge Beavis pointed out, A4 is broader than the federal law. If we were to challenge the constitutionality of the federal law, then I think it would be appropriate for the agency to have an opportunity to defend the constitutionality of that statute. But I don't think the court needs to get there. The state statute on its face is susceptible to that reading because of A4. Can we really apply the doctrine of constitutional avoidance as to the proper interpretation of that statute where the state has taken the opposite view on how the statute is properly read? Your Honor, I agree with you that the state has not defended its statute as it has not read the statute narrowly. The state does claim that it is coextensive with federal law. So, I think it would be a fair question for my friend on the other side exactly how they understand their statute to be coextensive with federal law when it plainly is not. But, Your Honor, I think it's important to note that the state's entire defense of S. 3292 on the First Amendment depends on it being coextensive with federal law. To start with their assessment of whether this is speech or conduct, the reason that they argue it is conduct, and I obviously disagree with that and I'm happy to describe why I think that's wrong, but the reason they say that the law is only regulating conduct is because they say it is requiring accreditation. If, in fact, they are barring speech for which the federal government does not require accreditation, that entire defense falls. Similarly, they argue that our speech is protected because we are violating federal law. If we are, in fact, not violating federal law, that defense fails. Let's talk about what is speech and what is conduct here. There's some basic factual things that are not clear here. You know, what are the things you're doing, you know, when you're doing research about the person's case or about the VA rights, etc., that itself isn't speech, is it? So, what are the speech components of what you're doing? Two responses, Judge Rivas. I think it is a little bit difficult to parse where the line between speech and conduct is with something like research because you have to understand the only reason that Veterans Guarding is doing that kind of research is in service of providing advice to the veteran. So, in the same way that, you know, you might say an author has to do research before writing a novel or writing a biography, to say that, you know, speech is only the last part of it, I think it's a bit constrained. So, I, you know, I think that it is a little bit difficult to say that that's not speech, but I also think the court doesn't need to get there because S3292 applies to advice on its face. This court's plain jurisprudence is that advice constitutes speech. Shouldn't we be looking at what it primarily does? I mean, why, if we're going to look to Del Castillo as a model and hear their activities like gathering documents and conducting research and perhaps translation and things that are separate from, in addition to, the giving of advice, if it's primarily as to those other activities, then why isn't it primarily regulating conduct? I don't think it's primarily as to those other activities. Judge Krauss, the law refers to advice on its face. It says advice and assistance. If Veterans Guarding cannot give advice, then it cannot speak. Is the standard primarily or is it more than incidentally? It is more than incidentally speech. Your Honor, I think, so I think we're talking past each other a little bit because typically the question of what a licensing regime regulates, whether it primarily regulates or primarily, excuse me, whether it primarily regulates conduct or primarily regulates speech arises because the law on its face does not refer to speech. This law on its refers to speech. So even if the court didn't want to get to the question of what a Veterans Guardian's activities New Jersey could constitutionally regulate because they are conduct, this law targets speech on its face. But it doesn't really, I mean, we may be picking apart the terms of the statute to do that. If we step back and look at it as a whole, why isn't this just a mechanism for enforcing a licensing regime? And it's a licensing regime as to the practice of providing consulting services or providing assistance with the filing of Veterans benefits where like with attorneys, with accountants, with doctors, that's something that is well within the tradition of regulation. Why shouldn't we think of it in those terms? A few responses, Judge Cross. Again, if in fact New Jersey's law goes beyond the federal law and prohibits activities that the federal law does not require accreditation for, then it is not a typical licensing regime. It is just a flat bar. And if I could use a hypothetical, if you assume for the sake of argument that the New Jersey legislature fully understood the meets and bounds of federal law as we see it and understood that in fact our practice is not prohibited by federal law, but nonetheless said, we don't like it, we don't want you to do that, and they pass exactly this law. Assume they pass A4, then we would not say that that's a licensing regime. We would say that's a bar on speech because the legislature is barring speech. Why isn't it just a licensing regime that sweeps in more in what is used as the practice of providing assistance with the filing of Veterans benefits? I mean, put aside whether it matches up squarely with federal law, if New Jersey decides that it wants to require the same accreditation as the Secretary would provide for assistance at earlier stages and that it's difficult to draw a line sometimes between what is providing consulting advice and what's providing legal advice, for example, so they were going to sweep it all in and say, this is part of the licensing regime. What's wrong with that? Why does that make this something other than a licensing regime? I don't think there's anything wrong with that, but that's not what New Jersey did. If New Jersey had said, we appreciate that Veterans Guardian performs this activity and we appreciate that there is at a minimum a good faith dispute about whether they are required under federal law to be accredited, but we believe they should be accredited. If New Jersey had set accreditation requirements, I would say then, yes, it is a licensing regime that sets accreditation requirements. Now, to the second point about how... Why does it matter whether New Jersey sets those requirements or New Jersey simply adopts the federal requirements? What's the difference? It gets a little complicated and we have to get into the weeds of the federal scheme, but the answer is because as the federal scheme is currently constituted and the way that the Veterans Administration understands the federal scheme, Veterans Guardian cannot be accredited and maintain its current business model. Explain whether you're eligible for accreditation, whether you've sought it, why it is that you think they're not eligible. So, the way that the current federal scheme is set up, the statute says that the services of agents... You cannot accept fees for the service of agents or attorneys except after a particular part of the... The A4 issue. Well, it's the 5904C1 issue and Veterans Guardian performs Services before that phase. Now, because the Veterans Administration does not believe that what our client does is consistent with the statute, they would not allow them to become accredited and continue their business working on the initial phase of the claim. I see. So, the whole business model... The entire business model cannot exist if they become accredited because of the way the VA reads the scheme. Have you sought accreditation from them? We have not sought accreditation directly. Of course, Veterans Guardian is fully confident that in the abstract, its employees could meet all of the minimal requirements, but what we have done is make efforts through lobbying to change federal law to make clear that our activities and our compensation structure are permissible and that accreditation could not be denied on that basis. But because of the way federal law currently exists, New Jersey's sort of effort to piggyback and say, well, you just have to become accredited through federal law. Again, it's a misunderstanding of how the federal scheme works. So, to explain, to understand how much A4 or 5904C1 burdens speech, it will help to understand, or as a tailoring matter perhaps, help to understand how the appeals or second step process works related to the first. If it's a trial de novo, it's not a big deal. You can raise all the issues. You can put in all the evidence later. If it's rigidly defined by what happens at the first step, then it's too little too late. Help us to understand the relationship between the first step at which you can't get paid and the second step at which you can get paid. Sure. It's certainly not as rigorous or unforgiving as civil litigation where, you know, if you don't support something in the initial phase, you're out of luck. But there are significant consequences to getting it wrong at the outset. Let me give you the example of if a veteran files a claim and says, I have a traumatic brain injury and I can't work for that reason. If they had had expert advice, if they had had the help of our client, our client might have said to them, you know, what you're really talking about is PTSD. Your symptoms are much more consistent with PTSD and you're much more likely to be successful if you claim for PTSD. If that veteran goes through the initial step and says traumatic brain injury, they can't change claims midstream. They'd have to go back and start over. And even in the best of circumstances where they get the claim right but they fail to support it, the result is going to be that they're going to be waiting for their benefits for years. There's a massive backlog as claims go through the appellate process. So, you know, our client is very proud to say that most claims are successful within 90 days. That means the veteran starts getting paid within 90 days. If they have to wait three years to ultimately have success on appeal, those are three years for which they're not getting paid. That affects the most vulnerable veterans more than anyone else, those that are struggling financially, those that may be older. The restriction on counseling before there's been an initial determination, that applies to both federal and state, right? I'm sorry, Your Honor, I didn't understand the question. The restriction on any compensated counseling before the rendering of an initial decision, that applies to both federal and New Jersey's law. That's actually where we have the strongest deviation, Judge Krauss. So, the federal law says no fees may be allowed for the services of agents or attorneys prior to the date on which an initial decision is made. New Jersey's 1A4 of S3292 says no person may accept any compensation for any services prior to the date on which the decision is made. The difference is 38 U.S.C. 5904C1 speaks of services of agents and attorneys. Exactly. That qualification is missing from A4 unless you somehow read it down from A1.  That's exactly right, Judge Bevis, and that is what puts our client out of business. Our work is with initial claims. Our compensation is for services rendered in connection with initial claims. And because we don't act in a representative capacity, they are not the services of agents or attorneys. So, it is A4 that effectively puts us out of business in New Jersey. And if I can just make one point. The way the Secretary of Veterans Affairs has read the federal statute, it would function the same way. That's correct. That's correct, Judge Krauss. But I just don't think that there's any way to read the statute as the VA does and actually give the words agent or attorney any kind of effective meaning. VA has never explained, nor has the state, how the statute makes any sense. And the way the VA will often do it, if you read some of the parts of the JA that cite the VA, they say, you may not assist in the preparation, presentation, or prosecution of a claim. And they just cut out the words as an agent or attorney. That's not consistent with how we read statutes, and certainly not consistent with how we would read a statute backed against the Constitution. Can I step back to the credentialing? Because looking at the federal statute, if we're looking at 5904, the requirements of moral character, good repute, experience, and training, and the qualifications and standards prescribed by the Secretary, why in the abstract could those not apply to employees of your client had they put in an application to be accredited? They absolutely could. And I'm sure they could surmount those requirements. The problem is the business cannot remain in operation if it's using the accreditation model as the VA sees it. Because the VA, well, to be clear, and there's letters from the VA in the Joint Appendix, I believe they start around 329, where the VA is very clear that if you have engaged in this background assistance that the VA thinks is illegal, they will not accredit you. So our client's employees could not be accredited just for that reason. But more importantly, more centrally, they cannot seek accreditation in order to continue their business. If they were to seek accreditation, they would have to completely overhaul their business model. We're in the record of those orders you're referring to? I'll check, Your Honor. But I believe it's around 329. I'll check before my rebuttal. Judge Cross, I wanted to come back, though, to the points that you made about the First Amendment, specifically Del Castillo, which I really would urge this Court not to follow that model, because I think it's wholly inconsistent with the jurisprudence of this circuit. Del Castillo was following pre-NFLA circuit precedents. That's exactly right. So, Your Honor, to your point about, yes, licensing schemes have existed for time immemorial, but the Supreme Court's decision in the NFLA case really did change, I think, the way that those schemes have to be regarded from a First Amendment perspective. To be clear, I do not think that those schemes largely fall. I think that the analysis has to be done a little bit differently. So what the Supreme Court said was states cannot have unfettered power to reduce a group's First Amendment rights simply by imposing a licensing requirement. I don't see any way of reading Del Castillo that's consistent with that. But more importantly, I don't see any way of reading Del Castillo that's consistent with this Court's decision in King, where the Court said that oral and written communications are speech and cannot be reclassified as conduct based on the functions they serve. King's holding is contrary to you, but King rests rather on its speech. But we got this professional speech doctrine, so let's use intermediate scrutiny. And that runs into NFLA. That runs into NFLA, and I think it's important to point out, Your Honor, the way that the state would have this Court decide the issue would actually go even further back than King. So what this Court said in King was, speech is speech, but it's professional speech, so we're going to review it under intermediate scrutiny. And the Supreme Court said, no, professional speech is no different than any other kind of speech. It has to be reviewed, first looking to the question, is it conduct or is it speech, which this Court did correctly, and then applying the proper level of scrutiny based on whether the regulation is content-based or content-neutral. What the state would have this Court do is say, if the state is restricting speech, i.e., making a law that has advice on its face, if they are restricting speech by virtue of a licensing requirement, that necessarily transforms into conduct, and no First Amendment scrutiny applies. I don't see how that's consistent with King or NFLA. Even if it's some First Amendment scrutiny, we also have a question of whether that would be strict scrutiny or intermediate scrutiny, and why shouldn't we read NFLA or the SARA, however we're going to reference it? I mean, it also says that you can impose content-based restrictions on speech if that is part of a longstanding tradition. And it cites favorably to Casey for the proposition that you can regulate speech as part of the practice of something like their medicine, subject to reasonable licensing regulation by the state. Judge Cox, I would argue I think that's a little bit of an overstatement as to how NFLA treated Casey. I think what the NFLA court said about Casey was that the informed consent requirement was incidental to the practice of medicine because it was directly related to a procedure, right? That was before an abortion was performed, the doctor was required to make a statement for getting informed consent. The incidental nature of the speech was that it was directly connected to a procedure. Here, this is speech alone. This is speech on its face. And I think also, if the court looks back to humanitarian law projects, what the court said in that case is entirely consistent with NFLA. In professional speech cases, like in anything else, you look to the question, what is triggering the restriction? And if it is speech, not conduct, or not speech incidental to conduct, you apply the regular level of scrutiny. Again, here, we don't even really need to reach the question, what is this law affecting? Because the law tells us on its face. A1A says, you may not advise for compensation. So even if this court only wanted to go so far as to say that that is a direct restriction on speech, and that is a content-based restriction on speech because it applies to a specific subject matter. How do we distinguish that from prohibition on legal advice without being licensed to practice law? Your Honor, again, I think most legal regimes are going to be broadly applicable and conduct focused and content neutral. So most licensing regimes for law are going to say, you cannot practice law unless you meet X, Y, Z categories. Most of that is going to refer to conduct. Certainly, there will be- You're saying, then, it is conduct to stand up in court. It is conduct to sign a pleading. It is conduct to put in a motion to the clerk's office, those things, right? So there might be issues with advising someone out of court, like how much can an accountant do versus a tax lawyer? But at a minimum, the in-court, court-related stuff for which you're required to have an attorney, we could define those in content-neutral ways, or maybe parts of them are just strict conduct. I think parts of them are conduct, and parts of them are just under a different regime because this is a public forum. Because of the historical tradition. Right, right. But the point I'm trying to make is that, generally, regimes are going to be broadly written so that they apply to some speech and some conduct. And it's going to be an as-applied situation in which you have to ask the question. But, Your Honor, yes. If a licensing restriction had the effect of restricting a lawyer's speech, a lawyer became unable to speak to their clients because of a licensing restriction, then I think the exact same framework would apply. You would say, that is speech, and then you would look to the question, is it content-based or content-neutral? I can't imagine a circumstance in which a licensing regime that broadly prohibited the practice of law would be considered content-based because that's too broad a subject matter, and it's not consistent with the way the Supreme Court defined subject matter focus in Reed. In fact, in the city of Austin case, which looks to Reed, Justice Thomas' dissent, I believe it's 1481, chastises the majority for saying, you've just decided that this is too broad a category, and it's not subject matter focus. I think that same rationale would apply if you had a broad licensing regime that applied to something like law or medicine. I don't think it would be considered a content-based restriction on speech. I think it would be subject to intermediate scrutiny, and I think for all reasons your Honor has discussed, it would survive. I think the aspect of it that goes to counseling as to legal advice, how is that any less content-based than counseling as to veterans' benefits? Again, I think that the definition is much more discreet and narrow, and therefore qualifies as a subject matter, whereas it's not at all clear to me that something like the field of law would qualify as a subject matter under the Supreme Court's content-based, content-neutral lines. But Your Honor, I think you're right that, you know, if you imagine the circumstance, say that the State Bar of New Jersey passed a new licensing regime that said you cannot advise clients for compensation on an issue of family law unless you have been practicing in the state for 15 years. So one day, all of a sudden, all of these family lawyers are no longer allowed to counsel clients for compensation. I don't think we would say that that's a licensing regime that is subject to no First Amendment scrutiny, but that would be the result of my friend on the other side of their view of this case. Don't we defer to state government, on occasion federal government, to identify professions where there is need to have regulation as to the entry into the profession? Yes. Like nutritionists, for example, right? Or spiritual advisors, if that was becoming a problem with fraudulent practices. If we're going to be second-guessing the definitions of professions that are identified by states, where do we draw the line? I don't think we're second-guessing anything. I think what we're saying is exactly what the Supreme Court said in NIFLA. States cannot have unfettered power to reduce a group's First Amendment rights simply by imposing a licensing requirement. If the state is directing, essentially restricting speech because of a licensing requirement on things like nutritionists and dieticians or spiritual advisors, if the state is taking those steps, the state has to justify those restrictions on speech through the appropriate lens of scrutiny. And I think in many cases, again, I think in many cases it will be content-neutral. In many cases, the broad application of the licensing regime will be conduct-focused. But you do have to ask the question. And again, I think there's nothing surprising about... Sorry to interrupt, but I want to make sure I understand your point before we move on. If we're talking... You keep saying unfettered. But if the application is intermediate scrutiny, that's not unfettered, right? No, no. And I think that would be perfectly appropriate. And I think in many cases, a licensing regime will be content-neutral, and intermediate scrutiny would apply. Do you think intermediate scrutiny is the right standard of review in this case, given your allegations as to the extent of speech that it covers? I do not, Your Honor, because, again, the law refers to advice on its face. And the question of whether the appropriate standard is intermediate or strict scrutiny depends on whether it is content-based. Sure. Advice and assistance. So how is that any different than as we were talking about the legal profession? There's conduct involved. There's also speech involved. It has both elements. Here, they simply described both elements on the face of the statute. Your Honor, again, I think the difference is essentially where, in most cases, you would be looking at an as-applied challenge. Here, the statute is vulnerable to a facial attack because it refers to speech on its face. But taking Your Honor's point, even if we looked only to the speech aspects of my client's work, if this court were to say, S-3292 is unconstitutional because it cannot be justified as a speech restriction on advice, that would allow, probably, our client to come back into business in New Jersey. The problem is, advice to clients is the heart and soul of what Veterans Guardian does. Everything else is in service of those efforts. So because S-3292 prohibits its advice, its speech, it cannot continue in business. So even if this court were to just look to the advice provision and say, assistance we can deal with. We can deal with that as applied. If this court were to strike the advice provision of A-1A, I think that would go a long way towards remediating the injury. I'd like to talk some about A-4. You did say, OK, you can't raise new claims. That's one harm. And another one is, you've got to wait three years. But tell us about what else can or can't be done at the second step. Can they add new arguments, new evidence, new disabilities after the notice of disagreement is filed? Or do they have to go back to square one? This gets a little tricky, and I would say it's outside my area of expertise. I'm not a veteran. Can you give us the citations to the places in the VA regs or whatever you would look for answers to this? I think it's likely in 14.629, and it's implemented the regulations that follow that. But again, it's really not my area of expertise. What I will say, Judge Bevis, it is supposed to be a flexible system. So there are lots of tools built in to allow the veteran to get the benefits that they're owed. So I think that the easiest thing, the easiest injury, or the easiest problem that follows not doing the best job at the outset is the delay. And that is a very significant issue. Delay and then having filed the wrong claim. Sure. But if you got the right claim, you're not arguing here there's a problem with introducing new evidence, introducing new arguments, et cetera. Well, Your Honor, it could be any of those things. I think all of these cases are different. If you look to our declarations, one of our plaintiffs talks about how he filed a claim for a disability related to his hip. It was approved, but then he realized it was approved for the wrong hip. And when he went back and tried to get it approved for the right hip, the VA claimed that it was not service-connected. So there are lots of ways in which these things go wrong. Our veterans guardians filed are littered with claimants who have tried to use VSOs, who have tried to follow the process on their own, and have been unsuccessful. And the problem, I think, is many veterans just give up. If they're unable to get their claim right the first time and get the money that is owed to them, they don't hire an attorney, or they don't follow through, and they simply give up. That's what happened with the two of our, with both of them. Let's say we think that there is a significant amount of speech in what you do. Let's say we apply either intermediate or strict scrutiny. What's the tailoring problem here? Why isn't this, what would better tailored alternatives look like to serve the asserted government interest in protecting veterans and preventing fraud? Thank you, Judge Rivas, for that clarification. Because I think if the question was, what is the tailoring problem with this law? The answer is it's not tailored to the interest that the state says it is, which is that it's not enforcing federal law because it's broader. But to your point, Judge Rivas, number one, I think that existing consumer protection law goes a long way. You can certainly use existing consumer protection law to target fraud or deceit on the part of any actor that's targeting veterans. To the extent that the state was concerned, and I believe they are because they included this in their law, that veterans know that they have free options available to them. I think a disclosure requirement that is factual would meet the Valor standard and be fine. And it's also, by the way, consistent with what Veterans Guardian already does. Veterans Guardian has no interest in charging a veteran for services that the veteran does not know they may be able to get for free. Veterans Guardian also tells veterans who are in their first year after leaving the military that their claims are presumed service-connected and they should go to a VSO because they will have no trouble at all. Veterans Guardian has no interest in taking money from veterans that the veterans don't want to give them. And that's why they have such a good record of success. But I think a disclosure requirement would go a long way towards addressing, you know, I read a lot of the state's arguments here as about, you know, we don't want anyone paying for a service that they can get for free. But of course, we pay for lots of services we can get for free. We can all do our taxes on our own. But many of us go to H&R Block because we want the convenience and we want the knowledge of an expert. So just the fact that the service is available for free is certainly not enough to justify burgling it. But the state could absolutely require Veterans Guardian to tell veterans that they can get these services for free. In fact, we already do that. If we have a situation here where we don't have anything in a record as to the extent of the burden on veterans, these sorts of consequences that you're telling us about now, but we don't have, you know, otherwise in the briefs before us, and even the nature of the credentialing process, should we simply remand and let the district court take a closer look at this as Invisalign? Or is there more with the very limited record we have that you think we could do? Your Honor, I disagree that we don't have evidence of the harm to veterans. Clearly, our declarations point out how each of our veteran plaintiffs tried to use VSOs and were unable to and want to use Veterans Guardian because of them. We have some harms to your particular clients, but this ties in with the question I was going to ask, which is about the other PI factors. Like we don't have fact-finding about the harms to veterans generally from not having this service. We don't have fact-finding about the extent of fraud. We have some citations to two very general news articles that don't focus in on specifically fraud by preparers. We don't have fact-finding about the public interest here and New Jersey's interest versus the federal interest. So, like, wouldn't we need fact-finding on those things? Let me set aside for one minute the other PI factors, because I think the question of harm goes to the state's justification under either strict or intermediate scrutiny. The state's inability to cite any harm, and, Your Honor, you're correct. They have these sort of broad statements. I think the FTC testimony is wholly irrelevant. I think their affidavit is the very definition of a conclusory affidavit. There is essentially no evidence of harm here, and I think that does go to the state's justification, not to the PI factors. With respect to, Judge Krause, your question about the accreditation, I don't think there's any dispute about what the accreditation standards are or the fact that in the abstract, certainly our employees could meet it. The problem, again, is that we cannot operate our business and be accredited. So, I don't think there's a need for any further fact-finding with respect to those questions. But having said that, it is absolutely apparent that the district court fully missed all of this and certainly missed the distinction between federal law and New Jersey law. And so, if this court wanted to remand to direct the district court to take another look at this with the understanding that New Jersey law, in fact, is not coextensive with federal law, you know, I don't see how the state can defend its law if that's the case. But, you know, if this court felt that that was as far as it was willing to go on this record, certainly we would appreciate at least guidance to the district court that the laws are not coextensive. Your First Amendment challenge is severable. That is, to the extent that you acknowledge that licensing regimes can be – that reasonable licensing regimes are within the power of a state to grant, your client would qualify, given the credentials here. But the terms of the New Jersey statute and federal law, as interpreted by the Secretary, preclude, without explanation, any advice or counseling that is compensated before an initial decision has been rendered. Can that piece of it be separated out for us to address, given the arguments that you've made to us? Absolutely, Your Honor, and I think that is the heart of this case. I think if that's as far as the court wanted to go, if the court wanted to say that in Section 532.92 precludes advice to veterans before the date on which a notice of disagreement is filed, and that is unconstitutional because the state has not justified the harm – the restriction on speech by showing a sufficient harm and showing that that harm is redressed, that would be great. That is all we're asking. I don't think there's any need to consider any other licensing regime. I think essentially that's to use the state's word, a red herring. This is not a licensing regime. This is a bar on our speech. And if the court were to go only as far as to say that A4 is unconstitutional, we would take that, because as A1 is stated, we don't violate it, and we would be very happy to just have A4 severed. So to be clear, if we were to view the credentialing requirement as part of a licensing scheme, but a total bar, even of those who might otherwise be licensed, of providing advice before the rendering of initial decision, that provides you with complete relief? That provides us with complete relief. Yes, there would, I think, still be an open question as to whether or not we violate federal law, but we believe in our good faith defenses on that. We believe in our statutory interpretation, and we are content to sort of continue our business even with A1 in place, because A1 goes no further than federal law. And again, we do not believe that we violate federal law. So I think, yes, that would afford us complete relief. How would it continue to violate federal law if we were to conclude that any restriction on even credentialed advice before an initial decision was unconstitutional? It doesn't. It doesn't, Your Honor. I'm simply making the point that A1 would remain in place, and A1 has the proviso, except as permitted by federal law. I think the state and I would continue to potentially have a disagreement about what federal law requires, but I would be content for my client to continue its business based on our understanding of federal law. To be clear, if New Jersey tried to enforce the statute against us based on their view of federal law, we would have our constitutional defenses. But for purposes of this argument, I think we would be very satisfied if the court were to strike A4. Thank you. We've gone over time, but to the extent that we continue to have questions, we appreciate the assistance, and we will hear from you as well in rebuttal. Mr. Zuckerman? Good morning, Your Honors. Michael Zuckerman on behalf of the Attorney General of New Jersey. Your Honors, we're up here on a facial PI, and I want to just dive into the court's questions because I think the colloquies illustrate many of the problems, actually, with this rushed litigation that asks for a state statute that was passed unanimously by our legislature in our view that it's a problem for people who won't take the simple step of getting accredited before they try to charge money in this field. Well, if we're looking at both the state statute and the way it seems to be interpreted by the Secretary, even those who are accredited couldn't give advice at the earliest stages when arguably it's most needed. So that's correct, Your Honor. 5904C1 and our A4 do very, very similar things, which is they establish a point at which we basically think it's de facto unreasonable to be charging a fee. I think a good example of this would be if you were in business being a healthcare claims consultant, but you convinced a bunch of seniors to pay you a bunch of money before you'd even filed your claim with Medicare, before you even knew if it would be denied. You might have a state that says that's actually quite unethical, and we don't want people doing that. Because we know you have a very high chance of succeeding when you first file it, we think there's a point at which— Your brief takes the position this isn't a speech restriction at all because it involves money. That runs straight into Simon & Schuster, where you could write your memoirs from prison, but you can't get paid for it. That's a speech restriction. How can you argue it's not? So, Your Honor, we have two paths. I don't want to fight too hard on that, because there's the Del Castillo line of cases. Again, there's the accreditation issue, and then there's the Brokamp line of cases, and there's this court's decision in Castillo. And so, if this court wants to assume, as the Second Circuit did just last year in Brokamp, that there is some burden on speech, the question just becomes, is it content-based or content-neutral? We have no problem with support. So that then takes out the district court's primary justification. Its secondary justification is, this is tailored enough because it just follows federal law. Well, it doesn't. A-1 does not follow federal law. It goes further. I thought Ms. Ciccone had some powerful points about what the restatement agency reaches and doesn't reach. You don't have an argument that these people are interacting with the VA, are standing in the shoes, are holding themselves out as representatives, correct? We do think they're agents under federal law. So two things about A-1. First of all, it directly incorporates federal law. Except it's permitted under federal law. Let's look at the federal statute. Because we can't apply Chevron deference to this. Chevron deference is no more. What in the federal statute does this violate if the federal statute is limited to agents or attorneys? Sure. Without attorneys, how are they agents? Here's what I think the federal law is doing when it says agents. Now, I agree. And I think there's some agreement. And I heard Ms. Ciccone concede some things that I think actually are very helpful. We now know from her presentation that they do fill out the forms for, they pre-fill the forms, then they give the pre-filled forms to the veteran. The veteran might make some changes, might not. So they're taking action on behalf of the veteran. Now, I take the point that there is one sort of black letter way of thinking about an agent, that you cannot be an agent unless there is some third party with whom you are speaking. I think that's been innovated somewhat over the years. For example, a psychologist who the service they're doing is they're talking to you. An accountant inside your company who just advises you about your book. A lawyer who ghost writes your complaint. All of those things I would say are agency relationships. These are plausible readings. And this is speech. Shouldn't we lean towards the construction of agent, which is probably the best one, at least a plausible one that avoids the very serious constitutional question. I think that our reading does avoid that question. And let me, I want to say two things about avoidance. First, I think it does because we're not asking you to say that agent means literally any conversation a person has. It has to be a fiduciary type of relationship. It's where you're signing a contract to pay a person money. They're going to give you a bunch of advice. They're going to pre-fill your forms. Again, we're up on a PI. We would love to have discovery about what exactly they do. SDNY wrong in the Upsolve case. I think SD, well, it's up on appeal in Second Circuit. I think that, I think Upsolve is actually a very good comparator for this because it shows how a narrow, you know, a group of volunteer, you know, not attorneys, but, you know, college kids and law students who want to help pre-fill a one-page form can show that they are extremely good actors. They're doing this for free. None of the concerns about fraud and scamming that exist in this huge industry, you know, are present in that situation. And so there could be, I do think that strict scrutiny was wrong in Upsolve, but, you know, intermediate scrutiny, we're not conceding that it wouldn't be lower than intermediate scrutiny, but we're fine with intermediate scrutiny. Has no record. It cites two news articles that say generally veterans are in trouble here. So you've got a couple problems here on the PI factors. One of them is you purport to be enforcing federal law when you're going beyond it. Certainly, A4 goes beyond federal law. Secondly, you're asserting this interest in preventing fraud when we don't have a record on the amount of fraud tied to this specifically versus the benefits. None of that was found below. So why should we not send it back for the district court to find, to make a record on the PI factors? So if you're not enjoining us and you're just sending it back for a greater record development, I don't think, we have no problem with the district court holding a hearing. We don't think you need to. We think you can affirm, and I'd like to talk about a bunch of reasons I think you can affirm, but in terms of showing the harms, I didn't, I think the harms here are quite clear. The day before we filed our brief, the Washington Post issued an I don't know how many thousand word expose about this broad industry that they facially now seek to allow to operate in New Jersey, not just in, you know, anybody. So I do also do want to push back on the idea that we are out of step with federal law. Let me tell you one other reason I think in context you have to read agent to be in opposition to attorney. I think what Congress was doing there is it's saying we have attorney people who are doing this work and we have non-attorney people who are doing this work. Call them agents. It could have said fiduciary. I think you should think of those as basically codes. But the question is what is this work? You know, the equivalent of what lawyers do of appearing in court. It's an agency, but fine. Standing up in the agency, signing papers in the agency, you know, doing stuff in a representative capacity, I think we can agree that's agent. But the question is why is it as an agent that they're preparing these papers? In Upsolve, you know, you suggested that Upsolve might be right. I mean, wrong on strict scrutiny, but right generally. And the court was willing to say that doesn't fall within the narrow historic tradition of regulating lawyers and members of the bar because you're not representing them in court. Why isn't the same logic? I agree Upsolve's a little different with student volunteers, but the same logic would say read it narrowly, read it as the in-court, out-of-court distinction, and the working on this stuff earlier, we can read as not within that tradition. I think a huge difference. I mean, I'm not commenting either way on what I think about Upsolve, but I think a huge difference between Upsolve and this case. If they were saying we're a small group of, first of all, if they were saying we're a law school clinic or we're a group of college kids who put together a community service group and we just want to do this for free, they're not covered by our law at all. They're fine. By all means, that's part of the tailoring of our laws. We say we do that. We just said they were obviously agents because they were preparing the papers. Now you're saying if they were college kids doing it for free, they wouldn't count as agents. You're saying that the dispositive difference is these guys are getting paid. The problem is getting paid because what both statutes, federal law and state law, are targeting are the risk of fraud that comes in. I got it, but agency law, the restatement of agency does not hinge. You can be an unpaid agent. Why should we read this law as making that dispositive when the restatement of agency tells us to? Because the statute's not covering unpaid agents. The statute doesn't say that. The federal statute says nothing about that under A-1. So the federal statute no longer talks about receiving, let's see. You're talking about the pre-1988 version of the statute, but the actual statute does not say that. We know the VA has said this. This is the VA's reading, obviously, and they know it's the VA's reading, and they have not sued the VA. I know the VA states it, but we don't use Chevron deference. That's six feet under right now. If you read those, I think the problem is, if you read C-1, it's 5904 C-1, it's the one that talks about the fees. If you read that to say that agent is only this narrow standing up in court version of agent or personally signing the forms yourself version of agent, I think you're actually walking the federal law into an under-inclusiveness problem because then you have Congress saying, we want the people who are signing their names, who are earning money to sign their names, to be under our oversight, to make sure they've done the three hours of CLE, we've done a character and fitness check on them. But as long as they're not signing their names and they're operating in the shadows, we're fine with them charging whatever they want and doing whatever they want. I actually think that's a very hard way to read the federal law. Just to pivot back, because you're not here defending the federal law, right? And you're not authorized to do that. That's correct. I think that's one of the reasons that if you could deny a PI alone is that it's awkward that they haven't sued the United States in what the district court's tailoring analysis said, we're just enforcing federal law. That's why it's narrowly tailored. Under state law, there's no question that A4 would reach those who were simply providing assistance, right? So I think there are, I mean, there are multiple ways to read A4 as this court talked about. This court obviously can't definitively construe A4. Under state law, you're not arguing that it's limited to agents in a narrow sense and attorneys, whatever that might mean under the federal statute. Your position as to the interpretation of the state law is that it reaches all assistance. We think A4 is doing what the VA thinks the federal statute is also doing, which is saying that if you're going to enter a contractual for money fiduciary relationship with someone to help them through this process, there is a point at which you can't do that at all. And otherwise, you just have to go through the accreditation process and get licensed to do it. So let's say that in the scheme of things, we view this as an accreditation scheme. It's a licensing scheme. And that the interests as to fraud can be addressed by requiring there be credentialing. Nonetheless, what do we have in front of us that provides any justification? Well, we have a law that prohibits veterans from obtaining that advice from consultants who they think provide better advice or get better returns. And so they're prepared to charge and to pay some compensation for. So I think the reasoning that, and this goes back to, I mean, there have been multiple different ways that Congress has addressed this problem. Since 1862, it's tried to make sure that the money that's going out of Washington veterans' pockets is not being siphoned off by people who don't have good character, who are basically engaged in some kind of scam. Assume that a credentialing scheme is in place. But if that credentialing scheme applies to folks providing advice before the filing of a claim, then what's the concern? Why aren't the interests that have been put forward fully satisfied? Because the concern at the earliest stage, if you're charging money for assistance so early in the process, we think that is essentially predatory behavior. Because the veteran already not only has free services available, but the first form they have to file is a fairly short form. Once they've advanced through the process, then you know that the case has actually gotten complicated. Again, that's why I go back to the example of, if you said seniors should be protected against health care claims consultants who try to charge them for just having their first claim initially submitted to Medicare before there's been any denial, I think a state could make the policy decision, that that is a de facto unreasonable predatory kind of fee. Because you have such a high chance of never having a complicated dispute at all. How can you say that it's predatory when even the amount of the fee is regulated, right? That's part of the accreditation. Well, the amount of the, again, it's not regulated if they're right. Because they're then outside the entire regulatory system. So it's not, I think in their world, the fee, they can charge whatever they want. You're not trying to regulate a reasonable fee. You're saying zero fee. And that, under Simon and Schuster, is a speech restriction. Only if that first step is where that particular condition comes in. So again, that's why I say that. There are scenarios where, I mean, the federal government regulates other types of benefits assistance and other kinds of things. You could imagine a situation where you say, look, if you're going to apply for Social Security benefits, that first step is really easy. You may say, excuse me, you may say it's easy. But we all, I mean, as those trained in the law and dealing with records and reviewing those records on appeal, we know very well that it matters what goes into an initial record. And it's one thing if you're submitting a receipt for reimbursement, you know, in a Medicare scenario. It's another when you're submitting a claim that depends on the documents that you attach, the justifications that you explain, what you put forward as, you know, in the terms that will be reviewed by the trier of fact. How can the state be stepping in to say that veterans can't have that assistance from those who they wish to engage and pay at the initial stage? Well, again, we think the federal government has also said that. So I do just want to be clear that if this court is basically giving them either sort of a backdoor form of declaratory relief against the federal government who they've never sued through a PI, I think that's itself kind of a problem because the federal government has never had a chance to defend why it has had 5904c1 and has used this early step, you know, there's a starting line basically model for when you can start charging fees. We're not reviewing a final determination here. This is a preliminary injunction. So, and it's a preliminary injunction of the application of the state law. So, with what we have in front of us and on the rather narrow question relative to how the federal regulations all function, what do we have in this record that indicates that there is any basis to preclude the giving of advice for compensation before a decision is rendered? Or if we look at it from the other side, the receipt of it or the right to petition? So, Your Honor, I think you have. Again, we're not, we wouldn't be objecting to some kind of limited remand for the district court to further suss out what's actually going on here. Again, this argument has had, the panel has had lots of questions about how does their business model work, how does federal law work. All of these are understandable questions that with more time and in a hearing could be, could be fleshed out. I think that we have the testimony that says there's this, especially since the PACT Act was filed, there has been a kind of gold rush of entities, perhaps, some perhaps quite well intentioned, some not. And, you know, again, in the world of an upsell, you could imagine a tailored as applied injunction says, well, we've, you've proven at the end of some period that you are in fact a good The district court rest on one Washington Post story, or should the district court maybe take some evidence? Again, we have no objection to the district court taking evidence. I think that goes back to why we think that denying a PI is also okay and having this go forward to a trial where they can, let's talk about tailoring. Judge Krause points out, this is speech, this is people paying for advice. Your justification is there's fraud out there. There's overcharging. Even if some fee cap might pass tailoring, why is it that $0 passes narrow tailoring or whether it's intermediate scrutiny tailoring or search scrutiny tailoring, why is $0 justified in the record as the right amount? Well, your honor, I mean, I just know as a historical fact, it was $10 up until 1988. And the Supreme Court in 1985 rejected a First Amendment challenge to that very, you know, fee cap in Walters. So I do think Walters is important here. And this whole long history of this unique system where you have federal money and the federal government putting reasonable restraints on who can use that as their own kind of revenue stream is important to recognize. I think, again, it's very important and tailored that it's only at that first stage where the starting line is pretty early, right? Once you file your Notice of Disagreement, you're free to hire an accredited agent. You're still not free to hire Veterans Guardian or another agency that is not accredited. But as long as you have someone who's accredited or someone who's doing it pro bono, like a law school clinic, you're absolutely free to hire them. And again, you're free to use the law school clinic even before because they're doing it pro bono. The only thing is there's this starting line before which, given the availability of free services, given the fact that it's meant to be an incredibly forgiving and flexible system, again, Walters talks about this, no statute of limitations, no real race judicata. You can file basically, you know, claim after claim. If you miss a disability in one, you just file a new claim. I heard them say, you know, I don't – they talked about a backlog. We don't have a record on that either. Again, that could be fleshed out at a, you know, at a hearing on remand on the PI. But we can't just wipe aside the significance of an initial decision, right? I mean, for many Veterans, it may be that they don't have the knowledge of the system or wherewithal to go. If they get an initial denial, that's where it stops. So, why would we tie the hands of Veterans to get advice earlier than that from consultants who they choose to hire? So, Your Honor, I mean, again, this is not, of course, the view of – if you look at the states and the VSO's brief on our side, you look at the testimony, not only what was heard by our legislature at the June 12th hearing, we have the link to that audio in our brief, but also what's been heard on Capitol Hill. The statements made by the VA publicly, which we also cite in the JA, you know, all of these talk about the risk of people basically – both the fact that there is – there are free services out there, that the system is meant to be flexible, and that only – and that the idea that someone is going to come in and convince someone that they need to hand over a percentage of their disability benefits for – you know, so early in the process is a recipe for basically preying on people who might, you know, be intimidated by the process and think, oh, I've got to give these people my money. And that's something that states have a valid interest in regulating. Again, saying, look, you're welcome to charge fees, just get accredited. And, again, if you –  HENDRICKS We've now heard from appellants that, clarifying their claim, they're not taking issue with the licensing regime. They're not taking issue with the need for credentialing to ensure that folks are qualified and have good standing and have taken whatever courses that are required for the Secretary to license them. Their concern is that, even so, they would not be able to conduct their business, which includes or focuses on the initial stage. BARTON So, Your Honor, I heard that from them from the podium this morning, too. I don't fully understand – I have to confess, I don't fully understand how to give them addressability if A4 is out, because they're still, as we in the VAC, violating our law as soon as they start charging money for helping prepare claims, once they're doing the ghost writing, establishing the fiduciary relationship. So, they're – BARTON That is the issue. But the First Amendment challenge, as they've narrowed it today, appears to be just to the provision of advice before the rendering of that initial decision. BARTON So, I mean, I think, again, this is where the construction of federal law matters, because the provision of advice before, at any point, if it's unaccredited for money, is going to violate both our law and federal law. I'm sorry, I'm not – BARTON They've acknowledged that it could be – could require credentialing. So, if we're looking at the First Amendment permissibility of doing a bar on compensation for any advice that is given to veterans about their claims filing before their claim is initially denied – granted, that may carry over to the interpretation of federal law, depending on how the Secretary views it, but that's not before us – why shouldn't we address that limited First Amendment challenge in connection with this preliminary injunction and conclude that, with what we have in front of us, this wouldn't pass – again, assuming it's – the licensing regime is in place, that there's been no justification whatsoever. BARTON So, I mean, I definitely have to disagree with the idea that there's been no justification for the initial sort of starting line model. Again, I think that goes back and exists both in our law and federal law. I will say, I think, you know, I think that the – if you were to issue – if the court is considering issuing a limited, tailored PI that would only enjoin A4 insofar as it sweeps beyond federal law or would allow them to give paid advice if they get accredited, I think it's not clear to me, I guess, how they have standing to ask for that relief when they've said they can't get accredited and they've said the whole problem is their business model is a business model that the federal government thinks is illegal. That's why I'm having trouble, I think, giving a fully satisfactory answer to the question, again, because this – we've learned this morning that this – their position is that they could – BARTON Well, your colleague represented this morning that they would have no trouble getting accredited. That's not the issue. The issue is that their business model is – includes providing advice before the rendering of the initial decision. So, in terms of the actual qualification, there is redressability, right? If that is in place and the focus of the First Amendment challenge, as narrowed in argument, is just to that segment of the process. BARTON I just – I'm having to – again, this is part of the – I think this goes to the problem of PIs and how quickly they can move, but we're learning this here that I've never seen anything in writing explaining why they think they could get accredited. We've never known. It's in the JA. Their explanation of this has shifted a bit, so I don't totally understand even this morning exactly why they don't – why they think they could now get accredited or how they would be able to operate under our law. BARTON Well, that's – they've made clear that that is not the nature of their challenge. So, you can focus on what is their challenge as they've explained it today. So, I think then, I mean, on A4 itself and much like C1, I think we would say that's a content-neutral, at least, if not sort of incidental burden on speech, it's at least content-neutral. You would apply intermediate scrutiny to it as a restriction of the way any field operates, does its fee charging, and it's a fee-structuring problem. So, again, there are other fee-structuring provisions in federal law that our law basically incorporates by reference, like you can't go over, you know, I think 20% or there's a reasonableness cap. Again, federal law used to have the $10 cap. I heard this morning from my friend on the other side that our, you know, the first amendment analysis would change somehow if we were not coextensive with the federal law, but I actually don't understand why it would. I think the way they're looking at this case, you're running strict scrutiny on anything that is putting any dollar cap. Yes, ours is no dollars charged before notice of disagreement is a lower dollar cap than $10, for example, although it might be actually better in some ways, because I think the $10 cap extended to more things, so you might make more money over the whole course of the case, depending on the facts. But I think you would still have to be looking at that as a, at most, content-neutral regulation of a professional relationship and a fee for a professional service, and we would submit that that type of fee is unreasonable and predatory when it's leveled so early in the process. Again, we could have more factual development on why it's needed so early. How hard is it to do these forms? I mean, the forms, you can look at the forms on the internet. They're not long. They're just prefillable things you can type things in. It's a lot of, you know, I think it's about seven pages of things to fill in, but it's a lot of just boxes in case you want to list things. A couple questions. Number one, my preliminary research suggests that New Jersey's courts ultimately were construing the New Jersey statute here. New Jersey appears to apply the canon of constitutional avoidance the way federal courts do. So, you know, we will construe it to avoid serious constitutional questions, et cetera, and so that would reflect the federal constitutionality problems as well, correct? I think that's right. I actually think the New Jersey courts apply a stronger version of avoidance than the federal courts do. I mean, I think one case you can look at, I would look at probably state versus Carter, which I'm just flipping to what the pin site is. I think it lays it out pretty well. It's 255A3, 1139. You could look to pages 1156 to 57. That's the 2021 decision of the New Jersey Supreme Court. It talks about this particularly strong tradition of avoidance, and in fact, New Jersey courts sometimes engage in what they call judicial surgery, where they'll basically either read in something or sort of construe something, I think probably a bit more robustly than the federal courts do in 2024 to save statutes. So, you know, it is another facet of this case that we're here on a PI in federal court where we need to construe a state statute. I do think that's- How far does judicial surgery go? Would a New Jersey court prefer to have A4 have an agent's or attorney's limitation read into it or have A4 stricken down? So their general approach is save whatever you can save, but I would say, I mean, I think they won't go beyond what the obvious implication of the statute is. And I think here, the statute is, I think, doing what the VA thinks agents is doing. So we do think it's a fiduciary relationship. We do think agents covers is prefilling the forms, even if you're only ghostwriting them and not signing your name. Right. And the other question is, if this case goes back and the district court ultimately denies a PI, would you oppose expediting, having an expedited trial, et cetera, if we're kind of concerned about what the interim harms are here? No, Your Honor. I think we would be fine with that. We're happy to, I think for all the reasons that DSSA lays out, I think this is the case. And I think this case can survive the final judgment. We would do what would be necessary to allow it to make its final judgment. If there was some reason, it couldn't. It may be the miscellaneous narrowing of the claim, as I understand it, preempts the need for this. But to the extent we are dealing with a question about the reach of the licensing scheme and whether, you know, post-Bisera, that should be viewed as strict scrutiny or intermediate scrutiny, should we hold this for the cert petition that is pending in 360 Virtual Drone Services? I don't think that you have to. I mean, we have no objection to you doing it. I think every, I think it's actually quite important to note that every circuit that's looked at this kind of broad facial challenge to a licensing scheme has either done it as speech incidental, conduct incidental to speech and done some sort of rational basis or no scrutiny. Again, we commend on the intermediate scrutiny path, we commend Brokamp, the Second Circuit's recent decision. I think cert was denied in that case already. I think Brokamp basically sets out a totally workable framework for how this can work. And I think this court's, I do think it's just important to say a word about how accreditation laws can't just be de facto content-based because they accredit certain fields. I think you could imagine ones that would potentially be content-based, for example, if there's some sort of backdoor function or purpose that seems like you're going after the speech. But cases like Becerra, cases like King, cases like Pitt News, cases like Holder are all great examples of how content-based laws are actually, there's something about the speech qua speech that the government doesn't like and it's going after. And it's uplifting terrorists. It's advertising alcohol around campuses. There's something about that speech that they're trying to tamp down on. We're not trying to tamp down on veterans advising services. We love veterans advising services. We just want, if you're going to make it a business model, a revenue stream, and you're an actor, we want you to get accredited and we want you to basically follow the rules of everybody else, which we understand to mean there's all sorts of regulations on the back that there's this waiting period where you can't charge at the sort of very front end. Are veterans able to get free consulting and services before initial decision? Yes, absolutely. The VSOs, we fund, we fund and the federal government funds VSOs. They're in here as amici for us. Again, that's in the record. Those resources are all there. Again, the Supreme Court in Walters in 1985 made note of that and that continues to be true today. Again, there could be more factual development. We feel very confident we'd be able to show that there's no paucity of free services available for those early stages. Again, the point I just want to note, it goes a little bit to Judge Beavis' question about are you going to be hopelessly lost if you screw it up too early in the process? Again, I think in this record, and we could develop it more, if you don't have everything right in your first argument, the system builds in a lot of checks. That's why- Your friend, Mr. Coney, gave a couple of cogent examples. One of them is guy claims wrong hip. He gets stuck then and it's not service related or PTSD versus a brain injury. The other one is you got to wait three years. I mean, for someone, for a veteran, justice delayed is justice denied if he has to wait three years for the benefits. Why aren't those powerful rejoinders? I don't think we agree. I'm not sure where the three years is exactly coming from. I've seen numbers that are much lower than that. It's a year, year and a half. Well, again, that doesn't mean you can't solve your pleading error earlier or your submission error earlier. I think my colleague was talking about a final answer through the whole appellate process maybe, but again, after you file your Notice of Disagreement, first of all, after you file your application, you can get free advice from people or free advice from someone who you will later hire when you get past the first post. But even after you get past the first post, you could then hire an agent who says, no, no, no, you just got past the first post, go change it right now so you don't have to wait a year to change it later in the process. So I do think there's a lot of built in, it's meant to be a very forgiving system. So I don't think it's a situation where Congress or New Jersey is trying to jam veterans up. Again, this bill passed unanimously through our legislature. I understand other states could make different policy calls, but as DSA points out, we are a laboratory of democracy. We do think some reasonable restrictions are appropriate here just like the VA has been calling for. But it sounds like the nature of this regulation is such that there's a recognition that counseling and advice is useful and in fact is drawn upon in the early stages. And New Jersey, as the legislature would have it in this statute, is fine with that as long as it's given by government speakers. But it's not okay with that in the same time period if it's given by private speakers who are receiving their compensation not through payment by the government, but through payment by the claimant. I don't think that's a correct characterization of what's motivating it, but I also don't think that renders it content based in any kind of way. I think you always, I think Camp Hill is helpful for this. You have to look at what the comparators are. And you know it can't just be that you're in one vertical and therefore another. You have to think about what are the two comparators. And here we think the clear comparators are people who get accredited and people who don't get accredited. And or are you charging money too early in the stage or less early in the stage? Neither of those turn on speech as the thing that's causing the coverage. So in a case like Pitt News or a case like Holder, it is the speech. It's helping the terrorists. It's advertising alcohol. That's what's bringing you in and out of the statute. The fact that we are covering a certain area of the world is not triggering some heightened First Amendment scrutiny. I think you know that by implication from City of Austin because the sign code there dealt with signs that regulate things in the world, which is different from signs that involve conceptual ideas. But it's not just a fact immediately content-based because on-premises, off-premises is about physical locations. And you could have a different regime for signs that involve conceptual ideas. You have to actually look at what's the real comparator that works here. And here the real comparator is are you charging an unreasonable fee or not as our legislature sees it. Again, they're free to disagree that it's unreasonable. And are you accredited or are you not accredited? So you could scrutinize those under different constitutional provisions, I suppose. But I actually don't see how you would scrutinize them under the First Amendment. I just don't think that holds up. And so again, we're happy to put in much more evidence about why this law makes sense, why it's adequately tailored. We think the fact that it lets you do whatever you want as long as you're not converting into a revenue stream is evidence of good tailoring because we're not saying that the well-meaning college kids and law school clinics can't get involved the way Upsolve brings up. I do also just want to say one more thing about the record. I think I heard, you know, DSSA talks about the problem of kind of a couple affidavits and we decide what's happening in the world based on that. And I heard my friend say that I guess there are two affidavits. They had both tried working with VSOs. I don't even think that's true. I was rereading their affidavits last night. It looks like only one of them tried working with a VSO. He then tried to go, that's Colonel Rudman, he tried to go to Veterans Guardian. It sounds like he wasn't really, they hadn't even analyzed his questionnaire before the law passed. He still got benefits. So that calls into question to some degree whether, you know, the services Veterans Guardian is selling are actually needed. But then Sergeant Soto, I think his declaration, and Mr. Ciccone can tell me if I'm wrong, says that he had tried another private company and then went to Veterans Guardian. The other private company didn't help him. So if anything, that supports our case because it means some of these private companies, even if you were to posit that Veterans Guardian could prove eventually that they're a good actor, I think it shows that some of these private entities are not good actors. And again, I don't mean to hang our case on a Washington Post article. I just think there's ample evidence that there are bad actors in this space. Happy to be convinced otherwise through a trial on the merits by my friends about Veterans Guardian specifically if that's what the facts show. But they're asking for a facial PI that lets everyone into this field. Can I get your clarification of something in the record? Because we have this statistic of 40% of the claimants from 2018 to 2022 the complaints were being made against unaccredited individuals and organizations. That seems, if I'm understanding this right, at J234 to 36, that's as to the OGC's Accreditation Discipline and Fees Program. So is that to say that 40% of the complaints were against unaccredited individuals and 60% were against accredited individuals? So we're on a PI where I think the state was doing the best it could with the facts we're able to gather in responding to their PI application. And I do think that that is one source that tells you this is a real problem. There are unaccredited agents out there. It's not a mirage. So my question is, since this denominator here seems to be the complaints that were received by the OGC's Accreditation Discipline and Fees Program, if 40% in this time period were against unaccredited individuals and organizations, does that mean that 60% were against accredited individuals and organizations? They read it that way. I don't have any reason to believe that's incorrect. What I would note is that because the complaints made to the VA's accreditation board, so it's not necessarily a representative sample of all the problems in the world. It's just telling you that the problem exists. You wouldn't necessarily go to the accreditation people to say – people might be more likely to go to the accreditation people to talk about problems from people who are accredited. So there's a lot of – you would need to know when someone feels they've been taken advantage of by an unaccredited entity, where do they go with that problem? I'm not sure that the ADF that they went to here is the one place or the only place you would go. So the fact that that numerator denominator is 40% out of 100 doesn't tell you that 60% of all bad acts here are done by accredited individuals versus unaccredited individuals. It just tells you that one place that people are complaining tells you that there are real problems from unaccredited actors, that they're not just a made-up problem. But in terms of the scope of the problem, we're not citing it for the idea that it tells you exactly whether it's – they're 40% of the share of the problem. I don't think it's the place you'd expect that data to show up. I just don't think we have good enough data, again, in this PI record to tell you what percentage of bad things that happen to veterans who are trying to seek benefits are because of accredited entities versus accredited entities. But again, even if you were to posit that there are also bad things happening from accredited entities, I don't think that should disempower the states under the First Amendment from caring about the problem with unaccredited entities as well. It also doesn't tell you the scope of those problems. Maybe it's a ton of money on the unaccredited side and smaller things on the accredited side. I mean, we just don't know enough there. So I think that's a good thing to come out of trial, but we would still urge you to affirm the denial of the PI or in the alternative to remand for more factual development. Thank you, Your Honors. Your Honor, that's exactly right. We've cited our reply brief. I believe at page 21 that you were exactly right about reading 40 percent versus 60 percent. And I would also point out that, first of all, that's their evidence. That's their best evidence of harm. And it not only shows that only 40 percent of claims of harm were made against unaccredited actors. If you look to the citation that we have in our reply brief, where you actually can find the raw numbers, it's 108 complaints over five years. 108 complaints over five years nationwide. That's roughly two in every state, if you assume that all states are equivalent. New Jersey has comparatively a very few number of veterans. I would be surprised if there was a single complaint from New Jersey. They could not find a single one. Their declaration says only that they are aware of incidences. It cites no facts. It cites no details. It doesn't even give you an anecdote. It was their burden because of the restriction on speech to prove that that restriction was justified. They fall woefully short under strict or intermediate scrutiny. I don't – it is not our burden to show that there is no harm. It is their burden to show that there is a harm that is to be redressed by a restriction on speech. And, again, they fall woefully short. MS. GOTTLIEB I just want to be clear what we're dealing with, at least after today's argument. And you are not challenging the constitutionality of the credentialing scheme. MS. GOTTLIEB We are not challenging the constitutionality of the federal scheme because the federal scheme does not injure us. The federal scheme does not impair our First Amendment rights. I did want to clarify.  GOTTLIEB To the extent that it would require credentialing of those who provide assistance.  GOTTLIEB But, Your Honor, it does not require credentialing for those who require assistance. If it did, I think we would be challenging it. But our view is that it does not. And to the extent –  STEINFELD In other words, you are not challenging its application to attorneys or agents on the understanding that you are neither attorneys nor agents. If we were to read the federal law the way New Jersey reads it, then you would have to challenge it. But there is a simple solution, which is to construe it as not applying to you. MS. GOTTLIEB That's exactly right, Judge Bevis. And, Judge Price, I just want to clarify. To the extent that I said that we could become accredited, what I meant was that, in the There is nothing about the accreditation requirements that we would not be able to  However, because of the way the Veterans Administration reads the scheme, we are not able to become accredited. And we cannot and will not become accredited. And –  GOTTLIEB Well, to the extent there's, you know, some portion of your challenge is, if we were to read this as reaching those who provide assistance and requiring credentialing, is that, in your view, is the credentialing scheme after Becerra, is that subject to intermediate or strict scrutiny? MS. GOTTLIEB Again, it would depend on the way that it's written. This one, if you were to – again, I don't think this is a credentialing scheme because New Jersey has not set any requirements for credentialing. New Jersey has just said you have to be credentialed by the Veterans Administration, which we cannot be. So, for us, it's a flat bar. But if we were in a world where New Jersey had said, as Judge Price – as you pointed out, they could have said, yeah, we want these people who we understand are acting legally, but we want them to be accredited. We're going to ask them to, you know, do CLE or to do whatever, I think that would be a reasonable step for New Jersey to take. I do think that under NIFLA, it would be subjected to First Amendment scrutiny if it was a problem for someone. And the way that you would analyze it was look to the question, is it regulating speech or conduct? If it is regulating speech, it would be, I think, doing so in a content-neutral way, and it would be subject to intermediate scrutiny. What I understand my friend on the other side to say is that we determine content – we determine content-based versus content-neutral based on who the speaker is. I don't think there's any support for that in any Supreme Court precedent. And, Judge Bevis, your decision in Camp Hill, I think, is very clear. You look to the comparator of what the speaker is allowed to say. Here, Veterans Guardian can be compensated for speaking to veterans about anything under the sun. They can talk about career counseling. They can talk about where the person should go to school, how to plan for a home loan. They can even talk about veterans' benefits provided by an agency outside of the VA. The only thing they cannot talk about and be compensated is a veterans' benefit matter as that is defined in the statute. That is a subject matter restriction on its face. There is no way to see it any other way. And even to the extent it's – it would be regulating speech, that is, having credentialing requirements as to the advice, we have the FARA saying that you can impose content-based restrictions on speech if there is persuasive evidence of a long tradition of that and that more deferential – it goes on in that context to talk about more deferential review in the two scenarios, one of which it characterizes as conduct where speech is simply incidental. So do licensing schemes fall under that description of a long tradition and properly be characterized as conduct-based with speech being incidental, again, even where the profession being regulated is one that includes the giving of advice? Let me answer that. I think that's two questions. Let me answer them separately. With respect to whether that would fall within a tradition, I think very well some licensing regimes might – a bar will very well might or licensing regimes for doctors very well might fall into that tradition. The state did not make that argument until its 20HA letter. They sort of, I think, you know, their gesture at it. But that argument is waived in this case. The state has never tried to justify this based on history and tradition separate and apart from the appropriate level of scrutiny. So I think that argument is waived here. With respect to the second question, could it be justified as conduct incidental to speech? In many cases, yes. But again, it's going to turn on how the law is regulating and what is the issue that is triggering the speech. I heard my friend on the other side say that all of the courts have sort of done it his way. That's absolutely not true. We pointed you to the Fifth Circuit's decision in Hines. And if you look to Hines and Visely, which Your Honor pointed out earlier, the Fifth Circuit follows exactly the framework that I'm urging this court to follow here. It looks at what is the nature of the activity that's triggering the restriction, is the restriction content-based or content-neutral, and applies the appropriate level of scrutiny. And I think insofar as this court already sort of has a leg up on other courts by having the very correct speech versus conduct line drawn in King, for this court it's quite easy. You've already done the hard work of determining what is conduct and what is speech. All you have to do is apply the standard content-based, content-neutral lines that the Supreme Court has already taught us how to do. Two, I think where we were getting to earlier in the argument with respect to A4, if this court were to strike A4 or to find in some way that A4 has to be understood as consistent with federal law, I do think that gets us a long way. I think where we ultimately end up is that the state and I have a disagreement about whether or not we violate federal law. That is a problem for us, to be sure, because the state is the arbiter ultimately at the first step of whether we're violating state law. So what I would ask from this court is I think this court could, sorry, taking a step back, I think the preliminary injunction factors apart from likelihood of success have obviously been met here. Judge Bevis, as you said, in the Delaware Sportsman case, First Amendment injuries are presumed here. It is not just the constitutional injury that we have been suffering. We have been out of business for 14 months. That is a very real and concrete injury and certainly feeds into the balance of equities here. Both our veterans have suffered and the company has been out of business. So I think it would be appropriate. The state has not put in evidence not only to support the harms that would justify a speech restriction. They also have not justified the – they have not countered our harms or our arguments on the public interest and the balance of the equities. So I think it would be appropriate because there's only one decision to be made here to direct the court to enter a preliminary injunction. If you wish to do that with respect only to A4, again, I think that takes us a long way, but it does – The Delaware state says injunctions are never mandatory. There's always discretion involved in them, even if all four factors are checked. So it's going to be a rare thing that we should be directing them to enter an injunction, unless we have findings on all those other factors already. That's – Your Honor, what I was speaking to is there. I think this court has case law in Coase and in Markovich that says that where the balance – where the other injunctive factors are only likely to come out one way, and essentially there's only one answer, that it's appropriate to direct the district court to the extent that, you know, you disagree and you think the district court should weigh the factors in the first instance. Of course, you know, we would be satisfied with this court recognizing, I think, what it seems to have already, that there is a speech restriction here and that it is not justified by the harm that the state – by the harm that the state has purported to address. And I would just – again, to the point about A4 versus A1, I think if you were to strike A4 from the law or to find that it has to be interpreted consistently with the federal law, where that leaves us is my client believes that it is not violating federal law and, for that reason, not violating New Jersey law. New Jersey disagrees. So that is a problem for us. Again, I would be happy to see A4 stricken because I think that goes a long way. But insofar as they wrongly read federal law, they have the authority to enforce their law against us, to issue a cease and desist to stop us from acting, and to impose money damages. So just do this to your points about agency. And I, of course, agree with you that agency requires a representative – a representative capacity. I think that the federal law, as it is imputed into New Jersey law, is clear and we do not violate it. I would just make one more point, which is you had asked for the citation. I had the numbers backwards. It is JA239 is the place where you can see how the VA would assess a request for accreditation from a company that has acted outside the accreditation system. And you can also see on that page VA's view is that federal law requires that a person must first be accredited by the VA before they may help prepare a claim for veterans benefits, even if they do so without charge. So you are right, Judge Bevis. They read agent, whether you charge or not, exactly the same way, as I think you have to. And I think what that tells you is that their reading of the statute is flat wrong, because it cannot be the case that Congress would have intended to stop a veteran from getting help from his mother to write their claim application. That makes no sense. And I heard my friend on the other side say that it makes – that it would be – it would be misaligned to have representatives be further restricted. But, in fact, it makes perfect sense, right? Congress might have wanted to say, where there is a relationship of trust, where there is an agency relationship, where they're going to be reaching out to this accredited agent to get information to the veteran, we want those people to be more qualified. We want to know that they have kept up with the regulations. We want to know that they don't have any felonies or anything else in their background. But we may not have those same concerns about someone who merely advises, who just helps the veteran understand how best to prioritize their claims and how to support them. So, in that respect, what Congress has done by setting additional requirements for agents rather than those who are just advisors makes perfect sense. And I think it's the VA's view that is hard to parse and, frankly, illogical. So we would ask this court to reverse the district court's decision. At a minimum, we would ask the court to make clear that federal law and New Jersey law do not align and that we do not act as agents such that we are violating federal law and, by default, violating New Jersey law. And we would ask the court to direct the district court to enter an injunction or, at a minimum, to vacate its decision denying one. Thank you. Thank you very much. We appreciate counsel's stamina and patience with all of our questions this morning. And a really excellent and very helpful argument, as well as briefing, including the briefing from amici in this case, which are also quite important and helpful for the court's perspective. As with the prior case, we'd ask that a transcript be prepared and that the cost be split.